IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUENTON THOMPSON,

                         Plaintiff,

        v.

HANNAH UTTER, ALANA ACKER,
LAURA SUKOWATY, BONNIE ALT,
DENISE VALERIUS, JAIME ADAMS,
SHERYL KINYON, and JAMES MURPHY,

                         Defendants.[1]

OPINION and ORDER

23-cv-381-jdp

---

Plaintiff Quenton Thompson, proceeding without counsel, alleges that prison staff failed to properly treat his severe back problems and the pain and numbness in his back, leg, and foot caused by those problems, both before and after he underwent a microdiscectomy surgery. Thompson originally brought Eighth Amendment medical care claims against a long list of defendants. Through my previous orders, Thompson's claims have been whittled down to only certain aspects of his treatment, against two officials who treated him at Wisconsin Secure Program Facility and six others who treated him at Columbia Correctional Institution.

The Wisconsin Department of Justice represents all but one of the defendants; they move for summary judgment. The remaining defendant, Dr. James Murphy, separately moves for summary judgment. For the reasons stated below, I will grant both of those motions and dismiss the case.

---

[1] I have amended the caption to include defendant Murphy's first name.

PRELIMINARY MATTERS

At the dispositive motions deadline, Thompson filed a motion for production of emails between defendants that I construed as a motion to compel discovery. Dkt. 144. I concluded that I wouldn't delay summary judgment briefing to resolve this late-filed motion, but because Thompson could still seek discovery before the trial date, I directed the state defendants to respond. In their response, the state defendants state that they did not fully respond to Thompson's request for emails due to confusion among the changing roster of DOJ attorneys handling his various discovery requests, and that they would have prison officials sort through and redact the relevant emails and produce them to Thompson. Thompson doesn't press the issue further. I will deny his motion to compel as moot.

After filing his summary judgment materials, Thompson renewed his motion for the court's assistance in recruiting him counsel, stating that he has mental health problems and learning disabilities, and that this case is particularly complex given the medical issues involved. Dkt. 195. I will deny Thompson's motion because he has done an adequate job of responding to defendants' summary judgment motions. As I discuss in more detail below, his submissions do not fully comply with this court's summary judgment procedures, but his submissions do make clear the disputed issues of fact and law in this case. Ultimately, the problem with his claims isn't his limitations in presenting his case. Rather, the medical records and other evidence submitted by the parties show that some of Thompson's allegations are unsupported by the facts, and otherwise defendants have not consciously disregarded his medical needs.

I turn to defendants' summary judgment motions.

2

UNDISPUTED FACTS

I begin by addressing flaws in Thompson's summary judgment materials. Thompson did not follow this court's summary judgment procedures by submitting stand-alone documents responding to each of defendants' proposed findings of fact and citing evidence supporting his version of the facts. *See* attachment to Dkt. 32, at 4. Instead he scatters responses to some of defendants' proposed findings, along with his own supplemental proposed findings, among several documents that Thompson concludes by stating under penalty of perjury that his statements are true. *See* Dkts. 164–67, 181. He also filed two substantially similar copies of his materials responding to the state defendants' motion for summary judgment. Defendants ask me to consider their own proposed findings as undisputed. But given the generosity with which I must construe pro se filings, I will consider Thompson's various sworn responses as declarations and I will not deem undisputed the facts that Thompson disputes with proper evidence in his response materials.

## A. Parties

Plaintiff Quenton Thompson is an inmate in the custody of the Wisconsin Department of Corrections. Relevant to the events in this case, he was housed at Wisconsin Secure Program Facility (WSPF) until November 2019, and at Columbia Correctional Institution (CCI) between May 2020 and March 2024.

Defendants Jaime Adams and Sheryl Kinyon worked at WSPF: Adams was the assistant health services manager and then the health services manager, and Kinyon was a nurse clinician and then the assistant health services manager. Defendants Alana Acker, Bonnie Alt, and Denise Valerius worked at CCI: Acker was the assistant health services manager and then the health services manager, and Alt and Valerius were nurse clinicians. Defendant Laura

Sukowaty, a physician, was an associate medical director for the DOC's Bureau of Health Services and was usually stationed elsewhere but she provided physician coverage at CCI. Defendant Hanah Utter, a nurse, was the assistant director of nursing for the bureau and was usually stationed elsewhere but at times she assisted defendant Acker with supervisory duties at CCI. Defendant James Murphy, who isn't represented by the state in this case, is a physician who worked at multiple DOC facilities, including CCI.

## B. Treatment before surgery

Thompson has a long history of health problems. His symptoms relevant to this case are lower back pain with sciatica, leading to pain and numbness in his right leg and foot. At some point he was diagnosed with a herniated disc with some nerve compression. He also was diagnosed with plantar fasciitis, contributing to his foot pain.

Thompson's remaining claims concern two distinct periods of time, the first being while he was at WSPF in 2019. Thompson was seen multiple times by defendants Adams and Kinyon for his complaints of back pain and other medical problems. Thompson says that they didn't provide him adequate treatment for that pain and that they delayed offsite treatment.

The second set of Thompson's claims concerns his treatment at CCI, jumping ahead a couple of years. Defendant Dr. Murphy began treating Thompson in October 2021. By this time, a previous provider had ordered Thompson a neurosurgery referral for evaluation and to discuss possible surgical intervention to address his back pain. Murphy saw Thompson several times in 2021 and the first half of 2022, treating him with various pain medications and aids like a TENS unit and wheelchair. Thompson was scheduled to see the offsite pain clinic and neurosurgery in January 2022, but Thompson tested positive for a bacterial infection, so those

appointments had to be cancelled and rescheduled. Murphy was not responsible for rescheduling those appointments.

By June 2022, Thompson reported that his symptoms were getting worse, including experiencing numbness in his right foot and his rectal and genital areas. Thompson adds that he told Murphy that he was experiencing incontinence. Murphy's notes explicitly state that Thompson wasn't experiencing incontinence, but at summary judgment I must accept Thompson's version of the facts. Murphy told Thompson that he had an upcoming visit scheduled with pain specialist for a steroid injection to address his back pain. Murphy responded to Thompson's new complaints by making another referral to neurosurgery in late June 2022. He also ordered a lumbar MRI. Support staff attempted to follow up with UW neurosurgery several days later.

Only days after having been seen by Murphy, Thompson submitted a health services request complaining of numbness in his buttock down to his right leg and foot, and of pain during bowel movements. Defendant Nurse Alt responded by referring Thompson to an advanced care provider, who had the authority to prescribe medication. Alt did not have that authority.

In early July 2022, Murphy met again with Thompson; his notes state that the neurosurgery appointment was a "high priority" because of Thompson's worsening symptoms. Murphy also placed orders for Tylenol, a special mattress, and cane. Murphy's note from that appointment also states that he increased Thompson's dosage of tramadol "[u]ntil more

definitive intervention can be done to relieve the pain like the pain clinic injections and neurosurgery." Dkt. 135-1, at 8.[2]

On July 15, 2022, Thompson was seen by Dr. John Choi offsite for a lumbar steroid injection. Choi's note stated: "The patient was originally scheduled for neurosurgery, but somehow something had changed and the patient was referred for an injection." Dkt. 159-9. Based on Choi's concern with Thompson's condition following a discussion of his worsening symptoms, Choi ordered an emergency MRI, which led to Thompson receiving microdiscectomy surgery the next day.

## C. Treatment after surgery

Defendant Dr. Sukowaty began treating Thompson in August 2022. In late August, Sukowaty canceled a neurology appointment scheduled for that December that would have evaluated the tingling and numbness in Thompson's leg; that evaluation was rendered moot by Thompson's July diagnosis and microdiscectomy.

In early September 2022, Thompson submitted two health service requests. In the first, he stated that he had numbness in his buttock down into his right leg, knee, and foot. He also complained of pain during bowel movements and about potentially having his tramadol discontinued. Alt responded, "You have your surgical follow up very soon." Dkt. 149-2, at 382. Thompson was seen offsite for a neurosurgery follow-up four days later.

Thompson's second request was about his gastroesophageal reflux disease and concern that his wedge pillow to treat that malady had been taken away. Alt responded by stating,

---

[2] Citations to Thompson's medical records are to the pagination created by the court's electronic filing system, not the internal Bates numbering used by the parties.

"Sorry. The order was still there. Not sure why it fell out of [the electronic record system]. I added it back." *Id.* at 381.

The report from Thompson's offsite neurosurgery follow-up several days later states that Thompson reported decreased pain, increased mobility, and improvement with his foot numbness. The doctor recommended physical therapy, which was approved. Thompson states that this doctor lied about Thompson's condition. But it's undisputed that the doctor's report stated that Thompson was improving.

In mid-September 2022, Thompson told medical staff that he was going on a "fluid strike" because his wedge pillow had gone missing. Around this time Thompson was moved to the segregation unit. Thompson states that at some point during his placement in segregation, Sukowaty told him that she would not see or treat him while he was in solitary confinement.

Shortly after Thompson's placement in segregation, Sukowaty saw him for his complaints of chest pain. Sukowaty saw Thompson at the end of September 2022 for a follow-up to surgery and his pain treatment. Sukowaty encouraged Thompson to take Tylenol for his pain; that drug is filtered through the liver unlike anti-inflammatories, such as ibuprofen, that are filtered by the kidney and could cause damage if the patient is not drinking fluids.

In mid-November 2022, Sukowaty ordered Thompson naproxen for his pain (it's unclear if Thompson was still on his fluid strike by then). In early December, Thompson requested a restriction mandating that he be handcuffed in front of his body; I infer that he made this request because of a shoulder injury. Sukowaty responded that he didn't qualify for a front-cuff restriction. According to Sukowaty, Thompson's physical therapist thought that Thompson's range of motion was good enough to be cuffed in back.

By mid-December 2022, Thompson was back in segregation. Sukowaty responded to Thompson's report of an episode of acute pain by ordering him a Toradol shot. At the end of December, Thompson wrote a letter to defendant Acker regarding the denial of a front-cuff restriction. Acker spoke with Sukowaty, who stated that she wasn't willing to order such a restriction until she was able to see him; Acker relayed that message to Thompson. In early January, Sukowaty saw Thompson for complaints that he couldn't move his right shoulder and thoughts of self-harm. Sukowaty recommended a sling and she ordered him naproxen.

A few weeks later, Sukowaty saw Thompson for his complaints of lower back pain, pelvic pain, and foot numbness. Thompson also stated that he had lost his heel lift. Sukowaty stated that Thompson's back was likely still healing from the surgery, but she ordered x-rays. She also ordered a new lift and physical therapy.

Over the next few months, Sukowaty again saw Thompson regarding his back pain. Throughout that period she ordered him naproxen, ibuprofen, Tylenol, and capsaicin cream, and renewed his TENS unit.

In April 2023, an MRI showed a recurrence of a bulge at the site of Thompson's surgery.

D. Medical shoes and heel lift

A related issue in this case concerns Thompson's efforts to obtain certain non-institution athletic shoes and a heel lift.

A couple of weeks after his July 2022 surgery, Thompson submitted a health service request about denial of shoes from an outside vendor after an offsite appointment. A report from a podiatrist shortly after the surgery stated, "Recommend continued use of 1 quarter-inch heel lift in left shoe gear and almost most importantly, non facility new balance DP/2E width athletic shoes greater than 75 dollars." Dkt. 149-1, at 685.

The shoe request was forwarded to the "Special Needs Committee," a body composed of at least one medical staffer and other security staffers who reviewed requests for medical restrictions or special needs like a low bunk. Thompson didn't request a heel lift; he had already been given one.

Defendant Acker served on the committee for this request. In making these determinations, the medical staffers on the committee determine whether a clear medical necessity for a special item or status is documented. The committee denied Thompson's request because there was no clear indication from the podiatrist of why non-institution athletic shoes were medically necessary, and because Thompson had already had a "medical shoe" request for "Orthofeet black Velcro 'bismarck' style" (recommended by defendant Murphy) approved by the committee in May 2022. *Id.* at 496.

In mid-August 2022, Thompson submitted a health service request asking why he had been denied non-facility New Balance shoes. Defendant Nurse Valerius responded, "New Balance Shoes are available in the approved catalogs for personal use. State shoes will be either state-issued brown shoes or Orthofeet Shoes (Bismarck Model) in this institution." Dkt. 149-2, at 384.

Thompson filed a grievance about the denial of medical shoes, listing the date of incident as September 1, 2022. Defendant Utter responded to the complaint examiner's inquiry about the issue on behalf of defendant Acker. Utter's review of Thompson's medical records showed that there was no mention of a medical shoe request in the notes of Thompson's September 1 meeting with defendant Dr. Sukowaty, but that Thompson did have an approved order for Orthofeet medical shoes. She told the examiner that "[p]odiatry recommendations are not DOC orders, they are only recommendations." Dkt. 53-3, at 7. The examiner

recommended dismissing the grievance. The reviewing authority dismissed the grievance and Thompson lost his grievance appeal.

In late December 2022, Thompson met with Acker and asked for a different pair of medical shoes or a new heel lift. Acker's note from that meeting states, "Order placed for orthotics to NovaCare, verbal order per Dr. Sukowaty." Dkt. 149-1, at 243. The record of that order show that it was for a "Nova Care heel lift," and that Sukowaty rescinded that order in March 2023, with the reason given as "Order Entry Error." *Id.* at 489. The prison physical therapist gave Thompson a new lift about a week before Sukowaty canceled the order. *Id.* at 516.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

The following Eighth Amendment claims remain in the case:

- Defendants Adams and Kinyon did nothing in 2019 to help Thompson for his complaints of back pain and otherwise delayed offsite treatment.

- Defendant Murphy changed his referral for surgery to a referral for a pain injection.

- Defendants Valerius, Utter, and Acker didn't follow an outside podiatrist's recommendation for a lift in his left shoe and for non-institution athletic shoes.

- Defendant Alt did nothing to help him after he complained of continuing pain in June and September 2022.

- Defendant Sukowaty canceled appointments for podiatry, "ortho," and imaging, and told him that she would not treat him while he was in solitary confinement.

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one

10

for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

## A.  Defendants Adams and Kinyon

Thompson alleges that in 2019, defendants Adams and Kinyon did nothing to help him for his complaints of back pain and otherwise delayed offsite treatment. These claims run into the same problem that I discussed in dismissing claims against another defendant earlier in the case: the statute of limitations for Thompson's Eighth Amendment claims is three years. Wis. Stat. § 893.53; *see also* Dkt. 143 (granting defendant Gavin's motion to dismiss on statute-of-limitations grounds). Because Thompson filed his original complaint in this case in June 2023, his claims against Adams and Kinyon are barred by the statute of limitations. So I will grant summary judgment to the state defendants on those claims.

**B.  Defendant Murphy**

Thompson alleges that defendant Dr. Murphy changed his referral for surgery to a referral for a pain injection instead, even though he knew that Thompson was urinating and defecating on himself, symptoms that needed medical intervention beyond a pain injection.

Thompson's claim is almost entirely premised on a July 15, 2022 offsite treatment note by Dr. Choi stating, "The patient was originally scheduled for neurosurgery, but somehow something had changed and the patient was referred for an injection." Dkt. 159-9. Choi's concern about Thompson's worsening symptoms led him to order an emergency MRI, which in turn led to Thompson receiving microdiscectomy surgery the next day.

Thompson takes Choi's note to mean that defendant Murphy converted his neurosurgery consult to a pain-injection appointment instead. But there is no evidence suggesting that Murphy did so. When Thompson began seeing Murphy about nine months prior, Thompson already had a neurosurgery consultation for his back pain scheduled. That consult was scheduled for January 2022, but it had to be rescheduled because Thompson had a bacterial infection. Murphy wasn't responsible for scheduling such consults. Murphy also referred Thompson to the pain clinic for a possible steroid injection.

By June 2022, when Thompson's symptoms were getting worse, Murphy responded by making another referral to neurosurgery in late June 2022. The medical records also show that support staff attempted to follow-up with UW neurosurgery several days later. In early July, Murphy met again with Thompson; his notes state that the neurosurgery appointment was a "high priority" because of Thompson's worsening symptoms.

So when Thompson was seen by Dr. Choi offsite in July 2022 for a steroid injection, he had outstanding referrals by Murphy for both an injection and a neurosurgery consult. And

Murphy wasn't responsible for the logistics of scheduling referrals. Dr. Choi's note that "somehow something had changed" at most suggests that there was confusion in scheduling the various referrals that Murphy had made. There is no evidence that Murphy canceled a neurosurgery consult or converted it to an injection appointment instead. Thompson's mere speculation that Murphy interfered with his needed treatment is not enough to create a genuine dispute of material fact. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). So I will grant summary judgment to defendant Murphy on this claim.

## C. Defendant Alt

Thompson brings two Eighth Amendment claims against defendant Nurse Alt. The first is about a health service request that Thompson submitted in late June 2022, shortly before his surgery. Thompson stated that he had numbness in his buttock down into his right leg, knee, and foot. He also complained of pain during bowel movements. Alt responded by referring Thompson to an advanced care provider; Dr. Murphy saw Thompson about a week later and increased his tramadol dosage.

Thompson argues that Alt should have done more to treat his pain than merely arrange for him to be seen by an advanced care provider. But in considering medical care claims, I must consider the totality of care that Thompson received, not just pick apart individual decisions. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Prisoners are not entitled to the treatment of their choice. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019). And as a nurse, Alt was limited in the treatment that she could directly provide. Thompson had

already been seen by defendant Dr. Murphy three times that month, including three days before Thompson's health service request to Alt. Over the course of that month, Murphy had made several orders to treat Thompson's worsening pain, including orders for over-the-counter medication, a Toradol injection, a course of corticosteroids, an increased dosage of tramadol, a bed wedge, a wheelchair, and a referral to neurosurgery. Alt didn't have the authority to order anything stronger for Thompson than he had already been receiving for pain; it didn't show conscious disregard for her to refer Thompson back to an advanced care provider to again address his concerns. I will grant summary judgment to the state defendants on this claim.

Thompson's second claim against Alt concerns a health service request that Thompson submitted in early September 2022 about his back, leg, and foot pain following his surgery. Alt responded that he had a surgical follow-up soon. Thompson indeed had a post-surgical appointment offsite four days later. I agree with the state defendants that this response couldn't lead a reasonable jury to conclude that Alt consciously disregarded his condition. Pain following surgery is a common occurrence. Alt couldn't prescribe Thompson stronger medication, nor was there reason to schedule a new appointment with an advanced care provider given his upcoming appointment with his surgical provider. In addition, Alt responded to another health service request that Thompson submitted the same day (inquiring about his wedge pillow used to help with his acid reflux) by checking prison records for that order seeing that the pillow had been removed in error, and fixing the problem by reinstating the order. This shows that Alt responded to Thompson's requests by taking action that she had the authority for. It wasn't conscious disregard for her to decline actions she didn't have the authority to perform. I will grant summary judgment to the state defendants on this claim.

14

**D. Defendant Sukowaty**

Thompson alleges that defendant Dr. Sukowaty canceled various offsite appointments and told him she would not treat him while he was in solitary confinement. In his complaint, Thompson alleged that Sukowaty disregarded his medical needs by canceling appointments for "podiatry; ortho; and an EMG." Dkt. 1, at 15. When I screened the complaint, I took "ortho" to mean orthopedics. Dkt. 12, at 8. But the parties' summary judgment materials make clear that what Thompson meant was an orthotics appointment.

The only evidence in the record of an orthotic-related cancellation was Sukowaty's cancelation of an order for a heel lift that Sukowaty says had been entered in error. Thompson argues that this shows that Sukowaty didn't adequately care for his foot pain. But the medical records show that defendant Acker entered the orthotic order based on a verbal order from Sukowaty in late December 2022 after Thompson complained that his lift wasn't fitting correctly. The record also shows Sukowaty ordering Thompson a new lift in January 2023. Sukowaty ordering a new lift or other orthotic doesn't suggest conscious disregard.

The record is unclear as to why Sukowaty later rescinded that order in late March 2023 as made in error. But the prison physical therapist gave Thompson a new lift about a week before Sukowaty canceled the order, so whatever reason Sukowaty had for rescinding his order, there's no evidence suggesting that Thompson was harmed by that action. *See Lord v. Beahm*, 952 F.3d 902, 904–05 (7th Cir. 2020) (to succeed on Eighth Amendment claim, plaintiff must show that he was harmed by defendant's actions or inactions). Thompson suggests that Sukowaty delayed providing the lift, but there's nothing in the record suggesting that Sukowaty was responsible for arranging delivery of a medical device once it was ordered. So I will grant summary judgment to the state defendants on this claim.

Thompson alleges that Sukowaty canceled a podiatry appointment, but at summary judgment, Thompson doesn't provide any evidence supporting this allegation; none of the medical records cited by the parties in their summary judgment show such a cancellation. So I will grant the state defendants' motion for summary judgment on this claim.

As for the cancellation of an EMG, it is undisputed that in August 2022, Sukowaty canceled a neurology appointment scheduled for that December that would have evaluated the tingling and numbness in Thompson's leg; Sukowaty states that she "believe[s]" that an EMG would have been included in that assessment. Dkt. 148, ¶ 122. I will infer that an EMG would have been included. But Sukowaty's reason for canceling that appointment was that in the interim, Thompson had emergency microdiscectomy surgery and he had received what Sukowaty believed was a definitive diagnosis for his condition. Thus, an appointment to diagnose his condition was no longer necessary. I take Thompson to argue that the surgery did not completely resolve his problems and that the failure to get further diagnostic testing led to the recurrence of a herniation at the surgical site. But the only reasonable inference from these facts is that Sukowaty exercised her medical judgment in deciding to cancel the neurology appointment as unnecessary in light of the intervening surgical procedure. Because Sukowaty used her medical judgment, Thompson can't win this Eighth Amendment claim against her. Whether Sukowaty's decision was wise might be a medical malpractice question, but Thompson doesn't bring any malpractice claims in this case. I will grant the state defendants' motion for summary judgment on this claim.

That leaves Thompson's claim that Sukowaty told him that she would not treat him while he was in segregation. The parties are unclear about precisely when Sukowaty made this statement or when Thompson was in segregation, but he was in segregation at least for a period

16

starting in mid-September 2022 and another from around mid-December 2022 to early January 2023. Thompson says that Sukowaty made this statement in front of defendant Acker. Both Sukowaty and Acker deny Sukowaty saying this, and they suggest that Thompson is confusing such a statement with a discussion that Thompson and Acker had (without Sukowaty present) in late December 2022 regarding Thompson's request for a cuff-in-front restriction. But because the state defendants move for summary judgment I must credit Thompson's version of the facts and assume that Sukowaty did tell Thompson that she wouldn't treat him.

Nonetheless, Sukowaty's statement alone doesn't violate the Eighth Amendment. *Cf. DeWalt v. Carter*, 224 F.3d 607, 612 (2000) (generally, verbal harassment does not violate Constitution). In his complaint, Thompson bolstered this allegation with his allegations that Sukowaty canceled various appointments. But as discussed above, there isn't any evidence suggesting that Thompson was harmed by any of these events, nor were these cancellations connected to Thompson's periods of segregation.

The record otherwise shows that Sukowaty indeed continued to treat Thompson while he was in segregation. Sukowaty saw Thompson in mid-September 2022 at the beginning of his fluid strike, responding to his complaints of chest pain. She saw him at the end of September for a follow-up regarding his back pain. In mid-December she responded to an episode of acute pain by ordering him a Toradol shot. And in early January she saw Thompson for complaints of a frozen shoulder; she advised that he use a sling, and she ordered naproxen for him. Other than Sukowaty's alleged statement to him, Thompson doesn't provide any evidence showing that Sukowaty neglected him during his stints in segregation. So I will grant summary judgment to the state defendants on this claim.

### E.   Defendants Valerius, Utter, and Acker

Thompson alleges that after his surgery, an outside podiatrist recommended that Thompson use a lift in his left shoe and obtain non-institution athletic shoes, but defendants Nurse Valerius, health services manager Utter, and assistant manager Acker did not follow these recommendations.

I will grant the state defendants summary judgment on Thompson's claims about a lift for his left shoe. The medical records indicate that Thompson had been given a lift before the events in question, and there is no evidence suggesting that he complained to these defendants or any other medical staff about needing a new one during the times relevant to these claims.

That leaves Thompson's claims about being denied New Balance shoes recommended by a podiatrist in July 2022. The only one of these three defendants on that committee was defendant Acker. The committee denied Thompson's request because the podiatrist hadn't explained why the certain shoe that he had recommended was medically necessary, particularly given the committee's previous approval of other medical shoes for Thompson. The Eighth Amendment does not entitle Thompson to demand specific care, *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), and it certainly does not entitle him to shoes from a particular vendor. Without a more specific rationale from the doctor about why these particular shoes were necessary, a reasonable jury could not conclude that Acker and the committee consciously disregarded Thompson's medical needs. Thompson says that the podiatrist was clear that the New Balance shoes were medically necessary, but in doing so he refers to records from a 2024 appointment with the podiatrist, Dkt. 178-4, which isn't the record from the relevant time frame. And in any event the 2024 recommendation from the podiatrist stated that Thompson could wear "a supportive shoe such as the Orthofeet or a new balance like stiff-soled athletic

shoe." *Id.* So even had the podiatrist included this information in his July 2022 instructions, that wouldn't have suggested that the New Balance shoes were a better option than Orthofeet shoes that the Special Needs Committee had already approved. I will grant summary judgment to the state defendants on this claim.

After the Special Needs Committee denied Thompson's request, defendant Valerius fielded a health service request about the denial and defendant Utter assisted in the response to a grievance. But a health service request wasn't the proper way to complain about the Special Needs Committee's denial of the shoes, and there's no evidence suggesting that Nurse Valerius could do anything about that request, so Thompson cannot maintain an Eighth Amendment claim against her. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. . . .").

Defendant Health Services Manager Utter couldn't unilaterally overrule the Special Needs Committee's denial of the shoes either. Perhaps had Thompson clearly explained why he thought the Special Needs Committee had incorrectly denied him shoes, Utter could have recommended a different outcome to the complaint examiner. But based on Utter's response to the examiner, it is clear that Utter didn't squarely address the committee's decision. Thompson's reference to the date of incident as September 1, 2022, led Utter to review records of Thompson's September 1 appointment with defendant Dr. Sukowaty, which said nothing about the shoe request. She otherwise noted that Thompson *was* approved for medical shoes, just not the kind that he mentioned in his grievance. The record indicates that Utter misunderstood which denial of shoes Thompson was complaining about. But that

19

misunderstanding isn't enough to show that she consciously disregarded his medical problem. So I will grant summary judgment to the state defendants on this claim.[3]

Because I am granting in full both sets of defendants' motions for summary judgment, the entire case will be dismissed.

ORDER

IT IS ORDERED that:

1.  Plaintiff Quenton Thompson's motion to compel discovery, Dkt. 144, is DENIED as moot.

2.  Plaintiff's renewed motion for recruitment of counsel, Dkt. 195, is DENIED.

3.  Defendants' motions for summary judgment, Dkt. 132 and Dkt. 146, are GRANTED.

4.  The clerk of court is directed to enter judgment accordingly and close the case.

Entered March 26, 2026.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

---

[3] The state defendants also contend that they are entitled to qualified immunity. Because I am dismissing Thompson's claims on the merits, I need not consider the state defendants' qualified immunity arguments.